HANLON, JUDGE:
This claim arises out of a construction project in Cabell County designated as Project X306-106-0.00, C-S/BRF-106(001)3 and commonly referred to as the East Huntington Bridge project. The parties are Barboursville Bridge Co., a West Virginia-based company and the West Virginia Department of Highways, the respondent. As part of the contract, claimant contractor, hereinafter referred to as Barboursville Bridge, was required to submit design computations and working drawings for the construction of cofferdams. On July 17, 1981, one of the cofferdams constructed by Barboursville Bridge collapsed, resulting in extra labor and costs. Claimant contends that he design approved by respondent was faulty and seeks an award f $272,852.88
Respondent alleges that claimant did not comply with the design specifications. More specifically, at the time of the cofferdam failure, the cofferdam wa snot in its final design configuration. The piling was not adequately keyed into the rock, and the rings were not at the proper elevations.
The East Huntington Bridge has four approach ramps that cross the Guyandotte River. To construct the approach ramps, it was necessary to erect four piers and subpiers. To erect the aforementioned bridge structures, Barboursville Bridge was required to construct four steel sheet piling cofferdams.
David Roberts, project superintendent for claimant as well as the designer of the failed cofferdam, described the method of constructing cofferdams. The outside sheet piling must be driven into the ground to a depth sufficient to provide support and prevent lateral movement. The water is pumped out, the overburden of dirt is excavated, and steel rings are placed inside the outer perimeter of the cofferdam's interior. After the rings are placed and the excavation is completed, the subfooter for the bridge pier is poured. After the subfooter is poured, the cofferdam wall is braced off against the bottom of the subfooter. At the time of the collapse, the riverside wall of the cofferdam gave way when digging operations for the pouring of the subfooter were in progress.
Barboursville Bridge submitted the originally designed cofferdam structure to respondent for approval by letter dated January 10, 1981. Respondent found this design to be *124 unacceptable. Two subsequent designs were submitted March 14, 1981 and April 10, 1981, respectively. The last design, which raised the bottom ring six feet above the original proposal, to comply with respondent's objections, was accepted, subject to a minor change.
Mr. Roberts stated that in designing these cofferdams the following were considered: "... the area which we had to encase to do our work, the material which we had to go down through, and the height of the materials and so forth to get our design pressures." although the four cofferdams had differing conditions, Mr. Roberts stated that the initial design was for the worst conditions to be encountered. The sheet piling was to be driven through all riverbed materials to a depth required to prevent any lateral displacement of the sheeting. However, the riverbed material was red shale, which is very unstable when exposed to air or water, rather than undisturbed rock. Barboursville drove the piling to a depth sufficient to prevent water from coming into the cofferdam. This is necessary to "key the rock", i.e., to provide sufficient lateral support for the piling. Roberts admitted that it is possible to drive into the piling to the point where the water is sealed off, yet insufficient to prevent lateral movement. Roberts also admitted he had no personal knowledge as to the exact elevation of the bottom ring at the time the cofferdam collapsed, nor could he confirm that the piling was adequately keyed into the rock at the time of the collapse.
Louis Koshar, an engineer with E. Lionel Pavlo Engineering Company, the consultant company, testified concerning Special Provision 212.5 which was written by Pavlo. He stated that this provision requires the claimant to build an internally braced cofferdam and to drive the sheet piling through all riverbed materials to a depth sufficient to prevent any lateral displacement of the sheeting. He explained that attachment A, the original design, was returned to claimant because the design as submitted was not representative of Piers, A3, A4, and B4. It was only representative of Pier B3. By returning it, Pavlo was permitting the contractor to submit separate designs for the other piers. Comment 7 required the claimant to submit its procedure for excavating, installing, dewatering the cofferdam, and pouring the concrete in the dry. Koshar stated that"... if you went to the support at elevation 495, which was the original design elevation, you might have gotten a displacement that might have been in the range of three-eighths of an inch ..." He testified that the provision calls for no lateral displacement. He admitted that if one keyed into the rock and got three-eighths of an inch displacement, that would be acceptable. Mr. Koshar has no experience working on cofferdams in the dry nor had he every been inside a cofferdam. He also stated that the contractor must assume that the materials into which the cofferdam is to be keyed will support it.
James Sothen, Supervisor in charge of the Consultant Review Section of the Structures Division of respondent, testified concerning keying into the rock. He stated that shale material"... is a very unpredictable material." It is a fair assumption to say that nobody can really predict what the material might do. "Well, this particular rock, generally the top surface once it's exposed to water and air, generally decomposes quite rapidly." He stated that to reach to a much harder type of shale, it would have been necessary to drive the sheet piling eleven additional feet. "At 11 feet, the farther you go, the more resistance on the rock you get," the witness stated.
*125 The respondent contends that Barboursville Bridge's actions in the week preceding the collapse of the cofferdam caused the collapse. Barboursville Bridge performed blasting operations inside of the cofferdam to prepare a surface for the subfooter. Employees also were utilizing an 80-ton crane to construct cofferdam A4 (the cofferdam which collapsed) within 25-30 feet of the land side of the nearest wall of the cofferdam. It was assumed that all construction would be done from equipment on the river side of the cofferdams. The aforementioned crane was on the land side of the nearest wall of the cofferdam. In addition, the day before the failure, respondent's records revealed that a "blow in" had occurred on cofferdam A4 requiring water to be pumped out. This should have provided Barboursville Bridge with notice that the walls were not sufficiently supported and that precautionary measures should have been taken to strengthen the support.
The Court, having reviewed all of the evidence, has determined that the major factor in the collapse of the cofferdam was the design requirement that the sheet piling be driven into material on the river bottom sufficiently to "key" into the rock, and that this was to be considered another ring for the support of the structure, rather than providing the support within the cofferdam structure itself. This appears to have been an impractical requirement considering the depth of hard shale material necessary for the sheet piling to reach in order to attain the desired support. However, the Court is also of the opinion that actions on the part of Barboursville Bridge contributed to the failure of the cofferdam and that Barboursville Bridge should have been more vocal in its objection to the design changes. Therefore, the Court is of the opinion to grant an award to Barboursville Bridge in the amount of $136,426.00.
Award of $136,426.00.